IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 27, 2009 Session

## STATE OF TENNESSEE v. DENNIS BURNETT

**Appeal from the Criminal Court for Monroe County**
**No. 04-098    Carroll L. Ross, Judge**

_____

**No. E2007-02258-CCA-MR3-CD - Filed August 14, 2009**

_____

A Monroe County jury convicted the defendant, Dennis Burnett, of second degree murder, and the trial court sentenced him to eighteen years in the Department of Correction. On appeal, the defendant argues that the trial court erred by: (1) refusing to grant a continuance based upon the defendant's medical issues; (2) refusing to grant a mistrial after a State's witness testified regarding information that had not been contained in his pretrial statements; (3) improperly informing the jury that a certain witness would testify when the trial court was aware that the witness was unavailable; and (4) refusing to grant a mistrial or call rebuttal witnesses after a co-defendant's witness offered perjured testimony. After reviewing the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE, J., joined. JAMES CURWOOD WITT, JR., J., filed a separate concurring opinion.

Charles G. Currier, Knoxville, Tennessee, for the appellant, Dennis Burnett.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; Jerry N. Estes, District Attorney General; and Chalmers Thompson (at trial) and James Stutts (at motion for new trial hearing), Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

Procedural History

The record reflects that in June 2004, the defendant was indicted, along with co-defendant

Spencer Coon, on one count of second degree murder following the death of victim Thomas Ratti, also known as "Yankee." Following a jury trial, defendant Burnett was found guilty as charged, and Coon was found not guilty. The defendant subsequently filed a timely motion for new trial, which the trial court denied. The defendant thereafter filed an untimely notice of appeal and a motion asking this court to waive the timeliness requirement of the notice of appeal in the interest of justice. This court granted the defendant's motion.

Factual Background

Although the defendant is not challenging the sufficiency of the convicting evidence on appeal, we will summarize the trial testimony to provide context. Detective Jeff Vittatoe with the Monroe County Sheriff's Department testified that he and other officers from his department found the victim's body in a Monroe County cistern. Detective Vittatoe testified that Coon initially led officers to a location where the victim's body was not found; after additional interviews, which he did not conduct, the officers searched for the victim's body at the location at which the body was ultimately found.

Dwight Bright testified that one morning he and Coon were working on Coon's truck at Bright's Monroe County garage when they heard a car pull up outside the garage some time between 9:00 and 10:00. He then heard two men arguing. Bright went outside, where he saw defendant Burnett and the victim fighting in the driveway. Bright heard Burnett accuse the victim of being a "snitch" and taking "either a ring or a diamond" from Coon. Burnett also told the victim that he "was going to take care of it." Bright told the two men that "they needed to take it on down the road," and the two men got into Burnett's truck. Bright and Coon returned to the garage, but they returned outside when they "heard some more racket." The two men saw Burnett and the victim fighting inside Burnett's truck, with Burnett pinning the victim down and hitting him in the head with a pistol. Bright saw that the victim was "cut pretty good" and bleeding from his forehead. Burnett drove off with the victim still inside the truck. Bright did not see the victim again, but that night he saw Burnett speaking with a woman named Leah Galyon. Bright heard Burnett tell Galyon that "she didn't have to worry about him being back to get any of his stuff or to bother her anymore," and that "he'd [taken] care of it."

Scott Stewart testified that early one morning between August 26 and 29, 2003—the time frame alleged in the indictment—he awoke to continuous knocking on the front door of his house. Upon opening the door, Stewart saw Burnett, who said, "'We took care of Yankee,' he took care of Yankee . . . they got in a fight and he was took care of." Not wanting to hear anything more, Stewart "cut off the conversation," at which point Burnett gave him a necklace which Stewart recognized as belonging to the victim. Burnett told Stewart that he "took it from [the victim] whenever he took care of him." Burnett also showed Stewart a .25 millimeter automatic pistol which Burnett claimed he used to "split [the victim's] head open" during the altercation.

Tennessee Bureau of Investigation (TBI) Agent Barry Brakebill testified that he took written statements from both defendants after the victim's body was recovered. In Coon's statement, he described an argument among the defendants and the victim outside a garage owned by Clifton

-2-

Bright, Dwight Bright's father. Burnett asked the victim if he had stolen Burnett's "dope," and Coon asked if the victim had stolen a diamond ring. According to Coon, he and Burnett hit the victim before Burnett searched the victim's pockets. Burnett pulled a ring out of the victim's pockets and said, "See, I told you he was lying." Burnett also "took a gun off of [the victim] right after the first punch. [The victim] acted like he was going to pull the gun and shoot us so Dennis took it away from him." After a fight that lasted approximately twenty minutes, Burnett hit the victim "right between the eyes with a pistol." Coon added that this blow was "a pretty good blow. [The victim's] head busted open and started bleeding," and the victim fell onto the ground.

After a while, Clifton Bright told the men to leave, so Burnett "threw" the victim into the back of his truck, Coon got into his car, and they drove away together. After a while, the two men pulled over, and Coon "told [Burnett] he could travel down [a particular] road, cross a creek, and dump the body on the right where [Coon] had planted [his] marijuana patch." The two men then drove away in different directions; Coon insisted that the victim was still alive at that time. According to Coon, he and Burnett did not talk about the victim after the incident.

In his statement, Burnett said that he had first met the victim two weeks before the "red truck incident," described above. He said that he knew that the victim and Rick Summey maintained a meth lab at Summey's house. A few days after this initial meeting, Coon and the victim came to Burnett's house so that Burnett and Coon could talk about Burnett selling his 1977 Ford pickup truck to Coon. Burnett claims that at that time, the victim stole a pocket watch and four knives. A few days after this incident, Burnett saw the victim at a Walmart. Burnett asked the victim to return the watch and the knives, but the victim drove away. Burnett claimed that he never saw the victim after the Walmart incident.

Agent Brakebill testified that he was present when the victim's body was recovered. The agent said that the victim's head appeared to have indentations around his skull, "but the [victim's] body was in a state of decomp[osition] and it was hard to really determine any type of injuries." He said that the victim's hands were bound with blue duct tape and positioned behind his back. On cross-examination, the agent admitted that a roll of blue duct tape was found in Burnett's truck but that the tape did not match the tape used to bind the victim's mouth and hands.

TBI Agent Malcolm Elrod testified that he interviewed Burnett two days after Agent Brakebill interviewed him. Burnett said, while driving to Clifton Bright's house, he saw Coon driving a red pickup truck and the victim driving a green Saturn. Initially, Coon and the victim were driving in the direction of Bright's house; however, they went in another direction before reaching the Bright's house. When Burnett arrived at Bright's house, he saw the Saturn there but not Coon's truck. He then saw Coon's truck pull into the driveway, with both Coon and the victim inside. Burnett walked to the passenger side of the truck, where the victim was seated, and Burnett asked the victim if he had stolen from him. According to Burnett, before the victim could answer, Coon hit the victim "and they started fighting and rolled out of the truck." The victim then pulled a pistol, which Burnett grabbed, and the victim and Burnett fought over the pistol. Burnett said that Coon and the victim fought for twenty minutes before Bright came out of the house and asked what was happening. According to Burnett, at that point Coon had his foot on the victim's throat. Burnett

then put his hand into the victim's pocket and pulled out a diamond which Burnett alleged the victim had taken from Coon. At that point, Bright told the men to leave.

Burnett told Agent Elrod that at that point, he gave the victim's gun to Coon and began to walk to his truck. Coon then told Burnett that "if he told anyone what happened that day, he would duct tape him, Burnett, to a tree, make him watch as he burned his family up in their house." Burnett then sat inside his truck for a while before seeing Coon "taking a tarp or carpet or blue duct tape out of [Coon's] red pickup truck." After driving away from Bright's home, Burnett saw Coon pass him in the green Saturn. Burnett told Agent Elrod that "he did not hear a gunshot, nor did he see if [the victim] was actually dead or not, but [Burnett] believe[d] that [the victim] was dead." According to Burnett, a few days later Coon gave him some knives that the victim had supposedly stolen from Burnett's home. At that time, Coon told Burnett that "he had put the body in a septic tank or a tank of some type at a place where a house used to be and that no one would find [the body]."

Randy White with the Monroe County Sheriff's Department said that in September 2003, he and other officers chased Coon's vehicle. He said that a second man was inside Coon's vehicle during the chase but that Burnett was not the passenger. He said that after a while, Coon and the other passenger left Coon's car and fled. The sheriff's department later received a call from a woman who said that a weapon had been thrown into the woods following the chase. The police returned to the scene where Coon's vehicle had stopped and found a nine millimeter Ruger automatic pistol.

Leah Galyon testified that the victim had lived with her before he disappeared. She said that both defendants visited the victim while she and the victim lived together. Galyon testified that eventually, she and the victim had a "falling out" because he began bringing drugs into their home and she did not want her eleven-year-old son, who lived with her, to be exposed to "anything like that." Accordingly, Galyon threw the victim out of the house, never to see him again. Some time after this "falling out" occurred, Galyon received a note from Burnett that the victim had "gone home;" Galyon presumed that this phrase meant that the victim had returned to Georgia.

Ronnie Walden testified that he, Burnett, and Coon were inmates at the Monroe County Jail in October 2003. Walden gave a statement to Agent Brakebill, which was read into the record, recalling how he overheard Coon tell another inmate "a story about what really happened during the murder of [the victim]." According to Walden, before the victim's death Coon gave Burnett an ultimatum: confront the victim about a stolen ring, "or [Coon] was going to believe that [Burnett] had stole[n] a diamond ring from [Coon]." Burnett and Coon then confronted the victim, with Burnett asking the victim questions about the supposed theft, but before the victim could respond, Coon began hitting the victim. Coon then asked for duct tape and a baseball bat. According to Walden, Coon said that he hit the victim "several times" with the bat and told the victim that "this was his last chance to give it up." Coon then duct taped the victim and asked "somebody," not necessarily Burnett, to search the victim for the ring. "Somebody" found the ring on the victim, and then Coon "just went off and came down on [the victim's] chest with his knees." According to Walden, Coon then said that he "blacked out and didn't remember much after that . . . the next thing he remember[ed] [was] that he was wrapping the body in the tarp." Walden told Agent Brakebill

-4-

that Coon dumped the victim's body.

James Walker acknowledged that he gave a statement to a TBI agent recounting conversations he and Coon had while they were inmates in the Blount County Jail. In the statement, Walker said that Coon had told him that while Coon "was on the run because of some meth charges, he and a guy named Burnett were involved in beating a TBI [a]gent to death. I'm not sure if Burnett took part in the beating or not." According to Walker, Coon said that both he and Burnett dumped the agent's body in a cistern. Coon told Walker that "Burnett was going around town bragging to people that they had killed an agent, and that [Coon] was going to kill Burnett too for talking." Walker also said that Coon "was concerned about a second body, but they moved him before I could talk to him more about that."

Dr. Feng Li testified that he performed the autopsy on the victim. Dr. Li said that the victim's "main injuries [were] consisted with blunt force trauma. They included multiple lacerations and multiple rib fractures, and a skull fracture." He said that his autopsy showed eight lacerations on the victim's head, with the injuries consistent with those caused by either a baseball bat or the barrel or handle of a gun. However, Dr. Li said that "[b]ecause of the condition of the body and . . . so many injuries, it's very hard to pinpoint which injury [was] caused by which object." He also said that the victim's mouth was tightly gagged with duct tape and that the gagging could have caused asphyxiation. Dr. Li testified that given the victim's decomposition, "it would be very difficult to differentiate" whether the victim's injuries or the asphyxiation was "the sole cause of death, so I put them together as . . combined, asphyxia and blunt force injuries to the body."

Sharon Stewart, an inmate, testified for Coon. She said that Burnett had provided her with drugs for about three months before the victim disappeared. Stewart testified that she and the victim went to Georgia to "pick up some dope" for Burnett. When they visited Burnett upon their return, Burnett went through the victim's clothes and became angry after finding a knife and gun that belonged to Burnett. According to Stewart, Burnett also accused the victim of keeping the money Burnett had given the victim to buy drugs. Burnett and the victim then left the house at around 9:00 that night; Stewart never saw the victim again. At around 6:00 the next morning, Burnett came to Stewart's house and told her that he had killed the victim by "beat[ing] him in the head with a gun and run[ning] him over."

Ralph Hunt, an inmate, testified that in October 2003, he was an inmate in the Monroe County Jail along with Coon, Burnett, and Ronnie Walden. Hunt said that Coon never said anything about the present case other than to say generally that "he was in a world of trouble[.]" He also recalled that Walden worked for Burnett before they were incarcerated.

Brandi Starritt testified that she was at Scott Stewart's house the morning that the defendant, whom she knew because he formerly dated her mother, visited. She heard Burnett tell Stewart, "you don't have to worry about [the victim] because he's gone and he won't be back." Burnett also tried to give Stewart a silver chain necklace that she had seen the victim wear. Starritt also recalled that when she went to the Monroe County Jail after this incident, she saw a couple of silver necklaces similar to ones the victim commonly wore hanging around the rearview mirror of Burnett's truck.

Coon testified that in August 2003, he was at Dwight Bright's garage when the victim pulled into the driveway in Coon's Saturn. Burnett then pulled up in his red work truck. After a while, he went outside and saw both men inside the truck, with Burnett in the driver's seat and the victim in the passenger's seat. As he got to the truck, Coon saw Burnett "backhand[]" the victim, which prompted the victim to reach for a pistol. Burnett and Coon then grabbed the victim's arm, with Burnett grabbing the gun from the victim. The victim asked to be let go; Coon responded by hitting him in the mouth. Burnett and the victim "scuffled around in the truck a little bit" before leaving the truck. Burnett hit the victim in the head several times with the gun. Eventually, Bright came outside and told the men to leave. The victim, who Coon claims was bleeding but conscious, tried to drive away in Coon's Saturn, but Coon refused to let that happen. Burnett then gave Coon the nine millimeter gun he had taken from the victim; Coon claimed the gun had the victim's blood on it. Burnett and the victim got into Burnett's work truck. Coon suggested that Burnett take the victim to a local market, but Burnett replied that "that was too good for him." Coon then suggested that Burnett leave the victim at Coon's marijuana patch. Burnett and the victim then drove away. Coon said that he did not see the victim after this incident but that as Burnett and the victim drove away he had no idea that Burnett would do anything else to the victim. A few days later, when Coon commented to Burnett that the victim owed him some money, Burnett replied that he had killed the victim.

Burnett testified that the altercation at Bright's garage began when he told the victim, "You, you stole from my house, you're telling people I'm a thief." He tried to say more to the victim, but before he could continue, Coon grabbed him and began hitting him. During the altercation, Coon began yelling, "He's got a gun. Someone get it." Burnett and the victim fought over the gun before the victim let go of it. Coon and the victim then continued fighting, with Coon beating the victim before taking off the victim's necklaces and emptying his pockets. Burnett claimed that eventually, the victim asked Burnett for help, but Burnett declined. Coon then began hitting the victim with a baseball bat; after striking several blows, Coon either "jumped up in the air, [and] came down on [the victim's] chest with his knees" or "stomped on [the victim's] throat." Burnett also claimed that after the beating, he heard Dwight Bright tell Coon, "You know what's got to happen now. It's gone too far. Just get it over with." He also heard Clifton Bright tell Coon, "Just shoot [him]." After a while, Burnett saw Dwight Bright and another man wrapping duct tape around the victims' mouth and "rolling him up in what I thought was a piece of carpet and moving him to the side of the road[.]" He later saw this same carpet being loaded into the trunk of Coon's Saturn. According to Burnett, Coon told him to keep quiet, otherwise Coon would burn down Burnett's house with Burnett's wife and children inside. He also claims that Clifton Bright said, "you don't think it's in me? . . . We burnt down [another man's] house." Coon told Burnett to tell Leah Galyon that the victim had "gone back to Georgia," and he instructed Burnett to tell Scott Stewart that his "troubles are over. His debts are paid. Whatever [the victim had] done to him, it's clear."

## ANALYSIS

### Plain Error

As the State notes in its brief, the defendant's motion for new trial did not specifically present

-6-

any issues for review, and the defendant did not file a supplemental motion for new trial. Because the issues the defendant raises on appeal were not specifically stated in his motion for new trial, they are waived on appeal. Tenn. R. App. P. 3(e). However, we will review the defendant's issues for plain error. "When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of an accused at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). In determining whether plain error review is appropriate, the following factors must be established:

(a) The record . . . clearly establish[es] what occurred in the trial court;
(b) a clear and unequivocal rule of law [has] been breached;
(c) a substantial right of the accused [has] been adversely affected;
(d) the accused did not waive the issue for tactical reasons; and
(e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). On appeal, the defendant has the burden of establishing that these five factors are met. State v. Gomez, 239 S.W.3d 733, 737 (Tenn. 2007) ("Gomez II") (citing State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007)). The appellate court need not consider all five factors if any single factor indicates that relief is not warranted. Smith, 24 S.W.3d at 283.

### Continuance

The defendant first argues that the trial court erred by refusing to grant a continuance, while the State replies that the trial court properly denied the continuance. After reviewing the record, we agree with the State.

In applying the first plain error factor to this issue, we note that the record does contain all discussion between the trial court, the State, and the attorneys for both defendants regarding the issue; however, it lacks certain exhibits that support the defendant's argument that a continuance was required. The record shows that on June 20, 2005, the day before the trial was set to begin, the defendant moved for a continuance. Counsel for the defendant noted that he had filed

> a motion with [a] supporting affidavit from a Doctor Todd Griffith of Maryville Orthopedic Clinic. The defendant Mr. Burnett has had surgery on his hand and finger, and he is, as Your Honor is aware from previous testimony, a stone worker, fabricator, and he's been taking medicines, and in the doctor's opinion will not have a clear mind for approximately four weeks. And so we would ask that the matter be continued at least to cover that interval . . . . [I]t was suggested during the break that we tender him for a drug test to confirm that those are the only drugs in his system, and we will gladly do so.

The continuance motion and supporting affidavit from Dr. Griffith do not appear in the record on appeal. The State expressed concern that the physician's correspondence "doesn't even say what [medications] he's on," to which defense counsel said that the physician indicated that the defendant

-7-

was taking "Q-flex, an antibiotic, and hydrocodone."

Counsel for Coon objected to the continuance, noting that most of his witnesses were available for trial. Regarding defendant Burnett's medical issues, counsel for Coon noted,

> I would feel a lot more comfortable if the doctor were here, because the way I read that third, that second paragraph, it's - - "the pain medication has been taken intermittently." I don't know what that means. I find it hard to believe that someone's on such heavy pain medication more than two weeks after an operation, which is a relatively minor operation, frankly.
>
> THE COURT: And it was outpatient, I agree with you.
>
> [COUNSEL FOR COON]: Yeah. You can get someone to kind of couch words anyway you want. "Significant concentration and reasoning." Well, obviously, we want him to be alert, but if he doesn't need to take those painkillers, then he should be alert.

The defendant's motion for a continuance apparently also concerned other issues which are not the focus of this appeal. After addressing those issues, counsel for defendant Burnett addressed the defendant's medical difficulties:

> [T]he doctor's letter is not ambiguous. Talking of Mr. Burnett, the end of the first paragraph, "Will continue to require a narcotic analgesics [sic] during this four-week post-operative period." That's talking from the 15th of June. "It would be inadvisable for him to participate in activities that require manual dexterity, such as writing, and the pain is likely to cause drowsiness and difficulty in concentration. It is medically inadvisable for him to participate in tasks that require significant concentration and reasoning."

During the discussion on the defendant's motion, the State said that "in looking at the schedule, it looks like August the 23rd, I don't show anything set." The trial court asked someone, presumably the clerk, if "you show anything that date, August 23rd." However, there was no on-the-record confirmation of that date's availability, and both defendants' counsel declined to speak regarding their availability on that date. The trial court ultimately denied the defendant's motion for a continuance, stating:

> I'm not going to continue the case. We can get [a witness whose availability was in doubt] here, if they can go ahead and send for him. . . . [I]t's evident [the defendant] had this operation two weeks ago. He can just not take his medicine tonight; take an aspirin. I mean, he's at the point surely that he do[es]n't need that kind of severe pain medicine, and he'll be okay then by tomorrow. But I can't - - we need to get to trial for this.

The trial began as scheduled on June 21, the day after the hearing on the defendant's motion.

We conclude that the defendant cannot establish any of the other plain error factors in this case, thus precluding our noticing plain error of this issue. Regarding whether a clear and unequivocal rule of law has been breached, we note that the defendant does not cite to any authority regarding the standard of review for granting a continuance. Rather, in his purported argument regarding this issue, the defendant cites to a string of cases addressing such disparate topics as mistrials, harmless error, and cruel and unusual punishment in capital cases. The State does provide relevant analysis in its brief. The Tennessee Supreme Court has held that "[t]he trial court's denial of a continuance will be reversed only if it appears that the trial court abused its discretion to the prejudice of the defendant." State v. Odom, 137 S.W.3d 572, 589 (Tenn. 2004) (citing State v. Hines, 919 S.W.2d 573, 579 (Tenn. 1995)). "An abuse of discretion is demonstrated by showing that the failure to grant a continuance denied [the] defendant a fair trial or that it could be reasonably concluded that a different result would have followed had the continuance been granted." Hines, 919 S.W.2d at 579 (citing State v. Wooden, 658 S.W.2d 553, 558 (Tenn. Crim. App. 1983)). In this case, the record does not show that the trial court's decision prejudiced the defendant. The defendant's physician did not testify at the motion hearing, and the affidavit from the defendant's physician does not appear in the record; thus, it is unclear what medications the defendant was taking during trial or the effects these medications might have had on the defendant. The trial transcript—particularly the defendant's testimony—indicates that the defendant was not negatively affected by his surgery or his medication. At no point did either the defendant or his counsel express concern over the defendant's ability to participate in trial. While at one point during trial counsel for both defendants noticed that the defendant's hand began to swell, defense counsel did not move for a continuance at that time, and the defendant did not suggest that he could not focus on the proceedings at that point. We accordingly deny the defendant plain error relief of this issue.

### Mistrial Based Upon Testimony of State's Witness

The defendant next argues that the trial court erred by not granting a mistrial after Tennessee Bureau of Investigation (TBI) Agent Barry Brakebill stated, at the beginning of his testimony, that an unidentified inmate at the Monroe County Jail had said that the victim "had possibly been beat[en] to death by Spencer Coon and Dennis Burnett." Agent Brakebill was present for the testimony of the three State's witnesses whose testimony preceded his own; the defendant argues that because the agent's testimony did not reflect his earlier statements, his testimony violated the rule of sequestration and required a mistrial. The State argues that the trial court properly determined that the agent's testimony was a misstatement rather than hearsay or a violation of the rule of sequestration and that the trial court's giving a curative jury instruction properly remedied the situation. We agree with the State.

The record does accurately reflect what occurred in the trial court. Agent Brakebill, the State's fourth witness, was present during the testimony of the State's first three witnesses: Detective Vittatoe, Dwight Bright, and Scott Stewart. Agent Brakebill began his testimony by stating that he spoke with an inmate, whom he did not identify, at the Monroe County Jail. The agent said that the inmate told him "that there was a boy by the name of Yankee that had possibly been beat[en] to

-9-

death by Spencer Coon and Dennis Burnett." Counsel for Coon then objected on hearsay grounds. In a jury-out hearing, counsel for Coon argued that Agent Brakebill's statement "poison[ed]" the jury:

> Not one of these [inmates'] statements say both of them beat him to death, not one. This agent just said, "Spencer Coon and Dennis Burnett beat him to death." Well, that means he, whoever this person is, ain't testifying, because I don't have it. And . . . that's just outrageous. . . . [W]hoever this is they're quoting isn't even here to testify.
>
> . . . .
>
> Your Honor, the State was allowed to have a special agent who has utmost credibility with this jury have an unnamed person prove their case. He testified to the ultimate issue, that these two men beat someone to death. I don't know how that's not for the truth of the matter. That's for conviction.

Agent Brakebill said Rick Summey, an inmate in a Kentucky prison, was the person who told him that the defendants had beaten the victim to death. However, counsel for Coon contended that Summey "was repeating what he'd heard, rumor on the street." The trial court, reading from Agent Brakebill's file, confirmed counsel's assessment of Summey's statement:

> "Rick Summey advised that Clifton Bright had told him that Spencer Coon and Dennis Burnett had got[ten] into a fight with a guy by the name of Chris, also known as Yankee."

The trial court, noting that Agent Brakebill's testimony represented a "misstatement" rather than hearsay because Summey had not told Agent Brakebill that the defendants had killed the victim, said that it would "instruct the jury that was a misstatement." The court also noted that it was "doing [its] best to not have to declare a mistrial." Counsel for defendant Burnett, who to this point had not made any argument regarding the objection, noted that this situation was "one of the kinds of things that [cases interpreting the rule of sequestration] were designed to prevent." Counsel then added,

> We will go forward, but I share the comments that my colleague has made about that and fully agree with the Court. This is simply adding serious injury on a case that is already fragile. I would respectfully ask that a curative instruction is insufficient. This jury . . . [is] probably going to like Agent Brakebill. He's a man who protects them. This is not something - - he gets the upper hand no matter what, and . . . I think that we are being forced into a mistrial or continuance to deal with this. . . . But this is continuing as a joint trial and any curative instruction will simply emphasize one defendant over another, and that adds to the problem.

The trial court assured counsel that it was "not going to emphasize one defendant over another," but counsel for defendant Burnett expressed concern that "Agent Brakebill's correction

is [going] to say, 'Mr. Burnett is the guy we were talking about.'" The trial court replied, "No, I don't want him to say anything that anybody said to him that was hearsay, as far as who committed this alleged crime, Mr. Coon or Mr. Burnett." The trial court then brought the jury into the courtroom and issued the following instruction:

> Now then, ladies and gentlemen, before we took our last recess, there had been a statement made by the [agent] about an alleged statement made to him by someone. There was an objection on hearsay. I have sustained that objection on more than one cause. First of all, he can't testify [to] what anybody said about the ultimate issues that we're here to decide. That's what the jury decides. Secondly, looking at his actual report, that's not what the person actually said to him. I will order you to disregard anything that [the] alleged witness said to him. He can testify to what he did based upon information he received from various sources, but he cannot testify to what any witness said period. I will also tell you that the alleged witness that gave him that statement that he misquoted on will actually be here to testify, so we'll hear from them what they actually said at any time or know about this case. So I would ask that you disregard anything said on that particular statement, and we will proceed at this point, pursuant to information he received, what did he specifically do.

However, the defendant cannot establish the other plain error factors. Regarding whether a clear and unequivocal rule of law has been breached, it is somewhat difficult to determine upon which rule of law the defendant bases his argument regarding this issue. The defendant cites to no authority regarding the standard of review for granting a mistrial, and while the defendant makes fleeting references to Tennessee Rule of Evidence 615, this court's opinion in Mothershed v. State, 578 S.W.2d 96 (Tenn. Crim. App. 1978), and the Tennessee Supreme Court's opinion in Smartt v. State, 80 S.W. 586 (Tenn. 1904), the defendant does not analyze the rule or examine the Mothershed and Smartt opinions, and he does not explain how the rule and the cases are implicated in the present appeal. In any event, the instant case reflects neither a violation of the sequestration rule or an event necessitating a mistrial.

The purpose of the sequestration rule, codified as Rule 615 of the Tennessee Rules of Evidence, "is to prevent one witness from hearing the testimony of another and adjusting his testimony accordingly." State v. Harris, 839 S.W.2d 54, 68 (Tenn. 1992) (citing Smith v. State, 554 S.W.2d 648, 651 (Tenn. Crim. App. 1977)). The rule provides, in pertinent part:

> At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing. In the court's discretion, the requested sequestration may be effective before voir dire, but in any event shall be effective before opening statements. The court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness. This rule does not authorize exclusion of . . . a person whose presence is shown by a party to be essential to the presentation of the party's cause. This rule does not forbid testimony of a witness called at the rebuttal stage of a

-11-

hearing if, in the court's discretion, counsel is genuinely surprised and demonstrates a need for rebuttal testimony from an unsequestered witness.

Tenn. R. Evid. 615. Before Rule 615 was enacted in 1991, our courts were clear that the prosecuting witness listed on the indictment was not subject to the rule of sequestration. See Smartt, 80 S.W. at 588; Mothershed, 578 S.W.2d at 100. However, in Smartt the court wrote that "the court should impose as a condition that the [S]tate, if it desires to use the prosecutor as a witness, should examine him first." Smartt, 80 S.W.at 588. "Smartt was decided when a testifying defendant was statutorily required to be the first witness for the defense . . . [thus] creat[ing] a symmetry by preventing either party from having the advantage of a witness being able to conform his testimony with that of other witnesses." State v. Timmy Reagan, No. M2002-01472-CCA-R3-CD, 2004 WL 1114588, at *17 (Tenn. Crim. App. May 19, 2004) (citations omitted). "Although the defendant no longer need testify first, we believe the Smartt rule generally remains in effect as shown in Mothershed." Id. at *18.

"Rule 615 does not prescribe a specific sanction for its violation. Instead, courts retain the discretion to impose a variety of sanctions appropriate to the circumstances." State v. Black, 75 S.W.3d 422, 424 (Tenn. Crim. App. 2001) (citations omitted). "The most severe sanction would be a mistrial or a ruling for or against a party on a particular issue. This draconian sanction should be used only in egregious cases, perhaps involving intentional violations of the rule for the purpose of creating perjured testimony." Neil P. Cohen et al., Tennessee Law of Evidence § 6.15[b] (5th ed. 2005). The decision of whether to grant a mistrial is within the sound discretion of the trial court, State v. McKinney, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996), and the trial court's ruling will not be disturbed absent a finding of an abuse of discretion. State v. Adkins, 786 S.W.2d 642, 644 (Tenn. 1990). The grant of a mistrial "is usually appropriate in a criminal case only where there is a 'manifest necessity'" for such action by the trial court. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996) (citing Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977)). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." Id. (citing Arnold, 563 S.W.2d at 794). On appeal, the defendant bears the burden of establishing that a "manifest necessity" for granting a mistrial existed. Id. This court has also concluded that for a defendant to be granted appellate relief based upon a Rule 615 violation, the defendant must establish that he was prejudiced by the witness's "improperly changing his testimony while hearing other witnesses testify." Timmy Reagan, 2004 WL 1114588, at *18 (citing State v. Sexton, 724 S.W.2d 371, 374 (Tenn. Crim. App. 1986)).

In the present case, Agent Brakebill's testimony appears to reflect, as the trial court held, a "misstatement" of his earlier report rather than his intentionally changing the testimony to reflect that of the State's first three witnesses. The trial court instructed the jury to disregard the agent's statement, thus remedying the damage caused by the agent's testimony. That harm was further vitiated by the ample proof presented after Agent Brakebill's misstatement that implicated the defendant in the victim's death. In short, Agent Brakebill's misstatement was not the only testimony implicating the defendant in the victim's death. As such, the agent's misstatement did not present a "manifest necessity" that "preclud[ed] an impartial verdict" and necessitated a mistrial. The defendant's inability to establish that a clear and unequivocal rule of law has been breached

precludes us from reviewing this issue for plain error.

### Trial Court's Reference to Potential Witness Referenced in Agent Brakebill's "Misstatement"

The defendant takes issue with the portion of the trial court's curative instruction, given after the jury-out hearing regarding Agent Brakebill's misstatement, in which the trial court informed the jury, "I will also tell you that the alleged witness that gave him that statement that he misquoted on will actually be here to testify, so we'll hear from them what they actually said at any time or know about this case." In his brief, the defendant argues that the trial court was aware that the defendant subpoenaed the proposed witness, Rick Summey, and that Summey "was physically present at court, [but] Mr. Summey had consistently refused to speak to the [defendant's attorney], a problem which [the trial] Court and counsel were aware and which effectively denied [the defendant] [Summey's] testimony. . . . [Summey's] attorney had refused to permit [the defendant's attorney] to interview Mr. Summey." (emphasis in original).

The defendant's argument regarding this issue appears in his brief as follows:

> The problem was [that] the jurors had been assured—by the Honorable Trial Judge—that they would hear testimony from Mr. Summey. [The defendant] respectfully submit[s] that this assurance compounded the problems of this trial as a process for finding truth, making the errors harmful beyond a reasonable doubt.

We disagree. In addition to failing to identify a "particular rule of law" that has been breached regarding this issue, the defendant misstates the facts supporting his issue. The discussion regarding Summey and the problems surrounding his testimony was held outside the presence of the jury, and the trial court's curative instruction did not specifically identify Summey as the person who would be testifying. The jury had no knowledge of Summey's connection to this case or any supposed problems regarding his testimony. Accordingly, we cannot conclude that the trial court's oblique reference to a witness who did not testify prejudiced the defendant or denied him the right to a fair trial. We therefore decline to notice this issue as plain error.

### Mistrial Based Upon Testimony of Co-Defendant's Witness

Finally, the defendant argues that the trial court erred by denying his motion for a mistrial after Michael Jerry Green, a witness for co-defendant Coon, offered what defendant Burnett considered "perjur[ed] testimony . . . falsely asserting that [the defendant] had a propensity for brutal violence and falsely asserting that [he] cooperated in the brutal beating of a man named Tommy Jones." In the alternative, the defendant argues that the trial court erred by refusing his request to offer testimony to rebut Green's testimony. The State argues that the trial court's denial of the defendant's mistrial motion and refusal to permit the defendant to call rebuttal witnesses did not constitute plain error.

In applying the plain error factors to this issue, the record does indicate what occurred in the trial court. After the defendant testified, Coon called Green as a rebuttal witness. Green testified

that "[t]wo or three years" before trial, he, Coon, and two of his cousins went camping. Green said that he and the cousins went to Tommy Jones's campsite, where they saw the defendant and his brother. Green asked the men where Jones was, and the defendant replied that Jones was "passed out over there somewhere." Green sent his cousins to look for Jones, whom they found locked in a horse trailer, the victim of a beating. Green asked the defendant and his brother, "Who did this to him?" The defendant's brother replied, "He got what he deserved," and the defendant added, "We done him the way he should have been done." Green testified that the defendant and his brother accused Jones of raping one of the men's wives, and he also said that Jones spent several months in the hospital after the beating. On cross-examination, Green testified that he had spoken to the district attorney's office in connection with the Jones beating and that the substance of his statement was the same as his trial testimony.

After Green's testimony, counsel for the defendant announced his intention to call rebuttal witnesses. The court, denied the defendant's request, stating,

> Counselor, with all due respect, I don't know that you can rebut character witnesses. You got character in; [Coon]'s got character now. I don't think you can - - we could be here for the next two weeks saying, "This person didn't do this and this person didn't do that." You've got character evidence in that he's a non-violent person. [Coon has] put evidence in that [defendant Burnett] is a violent person.

Counsel for the defendant then expressed concern that, prior to Green's testimony, there was no evidence that the defendant was involved in the Tommy Jones beating. The parties reviewed their records in that case and discovered that Green did not mention the defendant in his statement to the district attorney. The defendant moved for a mistrial, which the trial court denied. The defendant then asked if it was "possible for the Court to say that . . . there was no truth in this [witness's] statement?" The trial court replied, "I won't make that naked assertion. I will . . . dance around that any way you wish, but it's up to the jurors to determine truth or falsehood." The trial court instructed the jury as follows:

> As we closed yesterday, there was a witness by the name of Jerry Michael Green who testified about an incident that occurred . . . some two or three years ago now, and in his statement, he talked about the defendant here today, Mr. Dennis Burnett, being present at an incident that occurred at a campground. He also made assertions to the jury that not only did that happen, but that he remembered that he specifically in his statement told the officer to whom he gave his statement that those were the incidents, and that . . . [the defendant] was there. Defense counsel and the State reviewed the statement - - and we're not going to bring a witness in to testify. They just asked me to announce this to the jury. In point of fact, in review of Mr. Green's statement, there is no mention by him in that statement that Dennis Burnett was there. There's no allegation about him in any form or fashion in this statement. Furthermore, in review of the State's file of other statements made by people who were present at the time of that alleged assault, there is no mention by anybody in any statement that Mr. Dennis Burnett was present at that campsite, had anything to do

-14-

with the incident that was involved there, or was any way involved whatsoever. So I'm making you that announcement so we don't have to - - they've stipulated that, both sides did, so that I, we wouldn't bring in additional witnesses to tell that.

The defendant cannot establish the existence of any of the other plain error factors regarding this issue. As relevant to the defendant's contention that the trial court should have allowed him to call rebuttal witnesses, the defendant does not cite to any cases examining the standard of review for presenting character evidence, either directly or to rebut assertions made by other witnesses regarding a defendant's character. While the defendant does cite to the standard of review for granting a mistrial, the evidence in this case reflects that there was no "manifest necessity" for a mistrial in this case. While the trial court could not instruct the jury that Green's trial testimony was untruthful, as determinations regarding witnesses' credibility are the exclusive domain of the jury, its instruction that Green's prior statement regarding the Jones beating made no reference to the defendant essentially rendered Green's testimony incredible, thus vitiating any negative impact that the testimony might have had. The defendant is therefore not entitled to plain error relief for this issue.

<u>CONCLUSION</u>

Upon consideration of the foregoing and the record as a whole, we conclude that the defendant failed to allege any of his stated issues in his motion for new trial; therefore, they are deemed waived. Furthermore, following our plain error review, none of the issues merit relief. Accordingly, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE